## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CLINT PARKER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 5:18-CV-1960-CLS** |
| | ) | |
| CONSOLIDATED PIPE & | ) | |
| SUPPLY CO., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

The complaint filed by Clint Parker against his former employer, Consolidated Pipe & Supply Company, contains three counts. The first is based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and alleges that plaintiff was subjected to sexual harassment and a sexually-hostile work environment by his supervisor. The second also is based upon Title VII, and alleges that plaintiff was subjected to retaliation as a result of complaining about the sexual harassment. The final count asserts a state-law claim for intentional infliction of emotional distress. Following discovery, defendant moved for summary judgment. Upon consideration of the pleadings, briefs, evidentiary submissions, and oral arguments of counsel, the court enters the following opinion.

# I. STANDARDS OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court added a gloss to the language of that Rule, saying that summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the

materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. FACTS

Plaintiff, Clint Parker, is a 39 or 40 year-old white male who was employed as a "regular" (*i.e.*, non-temporary) delivery driver for Consolidated Pipe & Supply Company, Inc., for nearly two-and-a-half years, from March 7, 2016 through August 14, 2018.[1] He worked in the company's Decatur, Alabama, Branch. The facility in which Branch operations were conducted was divided into separate Warehouse and Office areas.[2] Industrial pipe, valves, fittings, and related materials were stored in the

_____

[1] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 17 (testifying that he was 39 years of age on August 14, 2019, the date of his deposition). Plaintiff began work for defendant as a temporary employee through a third-party employment agency sometime during 2015, *id*. at 41-42, but was hired as a "regular," full-time employee on March 7, 2016. *Id*. at 319-22 (March 2, 2016 Application for Employment); *id*. at 323 (March 7, 2016 Payroll Change Notice stating that plaintiff was "Hired"); *id*. at 342-43 (August 14, 2018 Termination Report & Memo).

[2] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit B (Declaration of Joey Lee), at 360, ¶ 5 ("The Warehouse and Office are entirely separate at the Decatur branch. Attached as Exhibit A is a diagram of the Decatur facility which shows the distinct locations of the Office and the Warehouse."); *id*. at 364 (Diagram depicting separate Office &

Warehouse prior to sale and delivery to customers.[3]  Four employees, including the

plaintiff,[4] worked in the Warehouse under the supervision of Warehouse Manager

Ronnie Breeding.  Clerical and sales employees worked in the Office under the

supervision of Office/Payroll Manager Glenda Vaughn.  Mr. Breeding did not work

in the Office, and he neither supervised nor exercised any managerial authority over

Ms. Vaughn or any other employees who worked in the Office.[5]  Ms. Vaughn was the

only female in the Decatur branch, and she spent virtually all of her time in the

Office.  She occasionally walked through the Warehouse for such purposes as

depositing trash in an outside container, or talking to a warehouse employee "about

a payroll, attendance or similar administrative issue," but she did not have any regular

work function that required her to be in the Warehouse.[6]  All employees, regardless

Warehouse areas).

[3] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 64-65, 68.

[4] The other warehouse employees were Ricky Barber (a white male in his mid-40s), Charles Dinsmore (a Black male in his early 40s), and James Moore (a white male in his mid-50s).  *Id.* at 69-71, 74-76.

[5] *See id.*, Exhibit B (Declaration of Joey Lee), at 360, ¶ 3 ("Mr. Breeding does not work in the Office at the Decatur branch and does not supervise or have any authority over any employees in the Office; he only supervises the Warehouse employees."); *id.*, Exhibit C (Declaration of Ronnie Breeding), at 366, ¶ 6 ("The Office where Ms. Vaughn works is entirely separate from the Warehouse where I work and the functions of the two are entirely different."); id., Exhibit D (Declaration of Glenda Vaughn), at 369, ¶ 3 ("I work in the Office at the Decatur facility and have never worked in the Warehouse.  I report directly to Mr. Joey Lee, Branch Manager in Decatur, and have never been supervised by or reported to Mr. Breeding, the Warehouse Manager.").

[6] *Id.* at 369, ¶ 4 ("I work almost exclusively in the Office handling payroll, billing and other administrative functions.  I do not work in the Warehouse and only occasionally go in or through the Warehouse to do things like emptying trash (on[c]e or twice per week) or checking with an employee

of whether they worked in the Office or Warehouse, were under the overall supervision of Branch Manager Joey Lee.

Plaintiff alleges that he was subjected to sexual harassment by his supervisor, Ronnie Breeding, during an imprecise period of approximately four months. The earliest reported incident occurred on or about October 25, 2016,[7] and the last during late January or early February of 2017.[8] The relevant paragraphs of plaintiff's complaint allege that:

---

about a payroll, attendance or similar administrate issue. I do not have any regular work function that puts me or requires me to be in the Warehouse.") (alteration supplied).

[7] The initial complaint about Warehouse Supervisor Breeding's behavior was not lodged by plaintiff, but by co-employee Ricky Barber, who informed Branch Manager Joey Lee that Breeding had "poked" him in the buttocks "with a broom [stick]" on or about October 25, 2016. Doc. no. 24-2 (Plaintiff's Response in Opposition to Summary Judgment), Exhibit B, at 108 (undated Employee Warning Report recording an incident date of "Approx 10/25/16.") (alteration supplied).

Lee asked plaintiff and another warehouse employee, Charles Dinsmore, whether they had witnessed the incident described by Ricky Barber, or been subjected to similar conduct. Charles Dinsmore affirmed that he had witnessed Breeding "poking" Barber with a broomstick, but denied that Breeding had subjected him to similar conduct. *Id*. Plaintiff affirmed that he also had witnessed the incident, but added that he also had been subjected by Breeding to the same conduct on an unspecified date. *Id*.

Branch Manager Lee "advised Ronnie [Breeding] that [his conduct] was unacceptable and would not be tolerated." *Id*. (alterations supplied).

[8] February 10, 2017 is the date of the second written warning issued by Branch Manager Joey Lee to Ronnie Breeding. It was based upon a complaint lodged by plaintiff, who alleged that, during either late January or early February of 2017, Breeding had again poked him in the buttocks with a broomstick. Branch Manager Lee met with Breeding on February 10, 2017, and his subsequent written report states that "Ronnie and I discussed the horseplay/harassment with the broomstick. He agreed this was inappropriate workplace behavior. We also discussed this activity would not be tolerated." *Id*. at 107 (February 10, 2017 Employee Warning Report). Plaintiff added during his deposition that, during this same incident, Breeding made "a comment about fitting pipe into my buttocks." Doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 197-204, 304.

11. Breeding subjected Plaintiff to inappropriate sexual remarks and touching.[9]

12. Specifically, Breeding made frequent comments that included jokes about homosexuality.[10]

13. Breeding touched Plaintiff inappropriately.

14. Breeding would grab Plaintiff by the shoulder and ask if Plaintiff needed a hug.

15. Further, Breeding grabbed a long pipe and asked Plaintiff how much of it would fit into Plaintiff's buttocks.

16. Breeding frequently commented about the size of men's penises.

17. On several occasions, Breeding took a broom handle and jabbed it into Plaintiff's buttocks area while Plaintiff was on a ladder pulling products off the shelf.

Doc. no. 1 (Complaint), ¶¶ 11-17 (footnotes added).[11]

---

[9] During deposition, plaintiff described the "inappropriate sexual remarks" referenced in paragraph 11 of his complaint as:

(*i*)   Breeding asking plaintiff whether he had any naked pictures of his girlfriend on his cell telephone (*id*. at 147, 152);

(*ii*)   Breeding telling plaintiff and co-employees Charles Dinsmore and Ricky Barber about his trip to the Smoky Mountains with a male "buddy," during which Breeding and his friend had "shared a bed," and that his friend's penis hung "down to his knees" (*id*. at 148); and,

(*iii*)   Breeding's act of showing plaintiff cell telephone photographs "of a bunch of celebrities naked." *Id*. at 152.

[10] Plaintiff was unable to relate during deposition *any* comments by Breeding, much less "frequent comments," that included "jokes about homosexuality." *Id*. at 148-49.

[11] The complaint paragraphs quoted in text mirror the accusations contained in the Charge of Discrimination executed by plaintiff on April 6, 2017, and stamped as "Received" by the Equal

In addition to the allegations contained in his complaint, plaintiff testified during deposition that, on three or four occasions, Breeding had dangled plaintiff's pay stub from the open crotch of his pants and said "If you want your check, come get it."[12] Another incident not alleged in either plaintiff's initial EEOC Charge or his complaint occurred when plaintiff was on a ladder, reaching for rolls of Teflon tape

---

Employment Opportunity Commission's Birmingham office on April 13, 2017: *i.e.*,

> 3. For the last year, I have been subjected to inappropriate sexual remarks and touching by my supervisor, Ronnie Breeding.
>
> 4. Breeding makes and has made frequent comments that include jokes about homosexuality.
>
> 5. Breeding also, [*sic*] touched me inappropriately.
>
> 6. He would often grab me by the shoulder and ask me if I needed a hug.
>
> 7. On another occasion, he grabbed a long pipe and asked me how much of it would fit into my buttocks.
>
> 8. He also made frequent comments about the size of men's penises.
>
> 9. On several occasions, Breeding took a broom handle and jabbed it into my buttocks area from below while I was on a ladder pulling product off the shelf.
>
> 10. After Breeding made the comment about fitting pipe into my buttocks, I reported the conduct. . . . .

Doc. no. 1 (Complaint), Exhibit A (EEOC Charge), at 9-10.

[12] Doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 160 ("I come in after delivery to go to get my check. I said, 'You got my check?' He said, 'Yes,' and sticks it down his pants in his crotch and leaves half of it hanging out, flipping over, and said, 'If you want your check, come get it.' It was just a check stub, because I've got direct deposit. I said, 'You can just keep that' and [I], you know, walked out of the office.") (alteration supplied).

used by plumbers to seal pipe threads.  Breeding came up from behind plaintiff and grabbed him on the back of the leg, "right below [his] butt."[13]

Plaintiff seriously injured his ankle on March 10, 2017,[14] one month prior to submitting his Charge of Discrimination to the EEOC.  He was denied workers' compensation coverage for the injury,[15] and filed suit in state court on April 11, 2017, five days after executing his EEOC Charge.[16]  His state-court complaint alleged that his injury was "the proximate result of an accident occurring on the job and during the course of his employment with Consolidated Pipe": *i.e.*, plaintiff "slipped while attempting to tighten a strap *while making a delivery* . . . ."[17]  Defendant denied that assertion, based upon several inconsistent statements made by plaintiff to co-

---

[13] *Id*. at 153-54.

[14] *See id*. at 338 (text Message sent by plaintiff to Branch Manager Lee on March 13, 2017, three days after his injury, and reading:  "Hey Joey I'm still at the doctor's office he just looked at my x-rays and said I have to have surgery wensday [*sic*] that *I broke the bone in 3 places and he* [is] *going to put some screws in* but I'm going to get a second opinion in the morning but I will let you no [*sic*] what the other doctor says") (emphasis and alterations supplied).

[15] *See*, *e.g.*, doc. no. 1 (Complaint), Exhibit A (EEOC Charge), ¶ 17 ("Recently, I was involved in an on the job injury.  After the injury, I was initially denied coverage for workers' compensation even though the accident occurred at work.  This resulted in lost pay and required me to pay for medical care that should have been paid by my employer.  Other people who have not complained about sexual harassment have their workers' compensation processed timely.").

[16] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 331-34 (copy of plaintiff's Verified Complaint for Workers' Compensation Benefits).

[17] *Id*. at 332, ¶ 5 (emphasis supplied).

employees about the time and place of his injury.[18] Plaintiff was off work for nearly

seven months, from March 11 until October 3, 2017.[19] He ceased reporting to work

on June 28, 2018, and was terminated on August 14, 2018, following forty-seven days

of unexcused absence.[20]

The EEOC dismissed plaintiff's Charge of Discrimination on September 17,

2018.[21] This suit followed.

### III. DISCUSSION

A.     **Count One** — *Sexual harassment*

In order to establish a Title VII hostile-work-environment claim based upon

sexual-harassment by a supervisor, an employee must show:  (1) that he belongs to

a protected group; (2) he was subjected to unwelcome sexual harassment; (3) the

harassment was based upon the plaintiff's gender; (4) the harassment was sufficiently

---

[18] *See id.* at 339 (March 13, 2017 text message from plaintiff stating "I was on lunch and I twisted it on the curb at the house [and] then I tried to work on it and I think I made it worse trying to do that so I went to the doc[tor] and they said it came lose [*sic*] from the bone and he popped it back into place and wrapped it up."). *See also id.* at 340-41 (summaries of conflicting statements made by plaintiff to co-employees about the place and manner of injury).

[19] *Id.* at 96, 111. Plaintiff's workman's compensation claim was settled on October 10, 2017, for $3,500, including future medicals. *Id.* at 335-36 (Consent Decree).

[20] *Id.* at 96, 111-12, 342-43 (Termination Report and Memo), 355-56 (same).

[21] *See* doc. no. 1 (Complaint), Exhibit A at 12 (EEOC Dismissal and Notice of Rights) ("Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge."); *see also* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 303 (same).

severe or pervasive to alter the terms and conditions of plaintiff's employment, and created a discriminatorily-abusive work environment; and (5) there is a basis for holding the employer responsible under a theory of either vicarious or direct liability. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)). *See also*, *e.g.*, *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985). The evidence related to those elements is discussed in the following sub-sections.

### 1.     Membership in a protected group

Plaintiff and Ronnie Breeding are both males. Even so, "Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998) (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983)).[22] Moreover, the

---

[22] The pertinent provision of Title VII provides that:

It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, *sex*, or national

Supreme Court has specifically held that "same-sex sexual harassment is actionable under Title VII." *Oncale*, 523 U.S. at 82. Indeed, "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." *Id.* at 79. Consequently, Title VII sexual-harassment claims will lie for male-on-male or female-on-female harassment. *See*, *e.g.*, *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242 n.10 (11th Cir. 1998) (holding that "same-sex sexual harassment can give rise to the same inference of impermissible discriminatory animus as does different-sex sexual harassment, depending on the sexual preferences of the harasser").[23]

## 2. Unwelcomeness

The EEOC Charge and complaint filed by plaintiff establish that he did not welcome the acts described in each.

---

origin; *or* (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of such individual's* race, color, religion, *sex*, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis supplied).

[23] *See also*, *e.g.*, EEOC Compliance Manual § 615.2(b)(3), 2006 WL 4672800 ("The victim does not have to be of the opposite sex from the harasser. Since sexual harassment is a form of sex discrimination, the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex. The victim and the harasser may be of the same sex where, for instance, the sexual harassment is based on the victim's sex (not on the victim's sexual preference) and the harasser does not treat employees of the opposite sex the same way.").

11

### 3.    Harassment based upon the plaintiff's gender

Same-sex harassment is actionable, provided it is demonstrated that the harassment was based upon the gender of the harassed employee.

> To make that showing, the plaintiff may present evidence that (1) the harasser was homosexual;  (2) that the harasser has a gender-hostility towards that particular sex in the workplace; or (3) the harasser treated one sex in a mixed-sex workplace differently than the other sex.

*Stancombe v. New Process Steel LP*, 652 F. App'x 729, 733 (11th Cir. 2016) (*per curiam*) (citing *Oncale*, 523 U.S. at 80-81).[24]    During deposition, plaintiff twice voiced his opinion that Breeding was either homosexual or bisexual.[25]    Such

---

[24] That part of the *Oncale* opinion cited by the Eleventh Circuit as support for the passage from *Stancombe* that is quoted in text reads as follows:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.  The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.  But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.  A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.  A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.  Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] . . . because of . . . sex."

*Oncale*, 523 U.S. at 80-81.

[25] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 153 ("He might have been bisexual, I don't know.  You don't go playing

proclivities were vehemently denied by Breeding,[26] and also rejected by Branch

Manager Lee.[27] Lee also denied a sexual motivation for Breeding's behavior, and

characterized it as "the sort of crude or vulgar locker room, grab ass, horseplay that

sometimes occurs in blue collar, industrial and . . . all male work environments."[28]

---

like that and grabbing – you know, sticking stuff up people's butt all the time; and when you're up on a ladder up there, grabbing you on the butt, and stuff like that, if you don't have tendencies, I think."); *id*. at 159 ("I thought he was queer just by the way – you know, homosexual just by the way – you don't grab guys. I don't grab guys."). *But see id*. at 163-64 (Breeding never asked to have sex with plaintiff); *Stancombe*, 652 F. App'x at 733-34 ("Stancombe admitted that . . . no 'explicit or implicit proposals fo sexual activity' occurred from which we or a jury could draw the inference that Woodfin's conduct was motivated by sexual desire. The fact that the conduct was sexual in nature is not sufficient on its own to show that it was motivated by sexual desire, because 'general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable.") (citations omitted).

[26] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit C (Declaration of Ronnie Breeding), at 366, ¶¶ 3-4 ("I have been married for 32 years and have a 17 year old daughter. I am 100% heterosexual. I am not homosexual, and have never been homosexual and have never had any homosexual tendencies or desires. Likewise, I am not nor have I ever been bisexual or anything like that.").

[27] *See id*., Exhibit B (Declaration of Joey Lee), at 361, ¶ 6 ("I am as certain as I can be that Ronnie Breeding is not homosexual. Mr. Breeding has been married (with children) for as long as I can recall and I have never heard or seen anything to make me think there was even a remote possibility that he was homosexual or bisexual."); *see also id*., Exhibit E (Declaration of Ricky Barber), at 372-73 ("I did no consider Mr. Breeding poking or goosing me with a broom handle or some similar object, to be sexual in any way.").

[28] *Id*., Exhibit B (Declaration of Joey Lee), at 361, ¶ 11. The full context of the statement quoted in text was as follows:

7. In October of 2016, Ricky Barber, a warehouse employee, complained about horseplay on Mr. Breeding's part. More specifically, Barber complained that on several occasions, while working out in the Warehouse, Breeding had come up or come by and poked or goosed him with a broomstick or similar object. I interviewed the other warehouse employees and one other warehouse employee, Clint Parker, said that Breeding had done that to him once or twice. All the other warehouse employees said that Breeding had never done that or anything like that to them.

8. As a result of that complaint and investigation, I gave Breeding a verbal

Plaintiff's co-employee, Ricky Barber — who also had been a victim of Breeding's offensive conduct, and the first to lodge a complaint about it[29] — agreed that Breeding's behavior was not "sexual," but "just horseplay . . . It was like high school locker room horseplay with one male 'popping' another male on the butt with a wet towel."[30]

---

9. In early February of 2017, Clint Parker complained that the horseplay/harassment on Breeding's part had not stopped – i.e., the poking with the broomstick. I checked and Ricky Barber indicated that nothing more had happened since Breeding's warning in October of 2016. In any event, I gave Breeding a written warning and told him that the sort of horseplay and conduct would not be tolerated. That is the same written warning marked as Exhibit 17 to Mr. Parker's deposition.

10. To my knowledge, there has been no further horseplay, harassment or similar conduct by Breeding since the February, 2017 warning.

11. *With regard to the conduct about which Mr. Parker and Mr. Barber complained, I never understood that conduct on Breeding's part to be sexual in any way. Rather, I clearly understood it to be the sort of crude or vulgar locker room, grab ass, horseplay that sometimes occurs in blue collar, industrial and most often all male work environments.* The Warehouse facility/operation in Decatur is definitely a blue collar, industrial warehouse operation.

*Id*. at 361-62, ¶¶ 7-11 (emphasis supplied).

[29] *See supra* note 7.

[30] Doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit E (Declaration of Ricky Barber), at 372-73, ¶ 5 ("I did not consider Mr. Breeding['s] poking or goosing me with a broom handle or some similar object, to be sexual in any way. To me, it was just Mr. Breeding playing around and carrying on — just horseplay on his part. It was like high school locker room horseplay with one male 'popping' another male on the butt with a wet towel."). Supervisor Ronnie Breeding admitted that, on several occasions while working in the Warehouse, he had

poked or goosed either Mr. Parker or Mr. Barber from behind with a broomstick. On each occasion, it was just a touching or goosing and not anything forceful. Regardless, they complained to Mr. Joey Lee, the Branch Manager, and he gave me

Regardless, the issue remains one of determining whether plaintiff has presented sufficient evidence from which a reasonable jury could conclude that Breeding's harassment of plaintiff was based upon plaintiff's gender. *See*, *e.g.*, *Ashmore v. J.P. Thayer Co., Inc.*, 303 F. Supp. 2d 1359, 1369 (M.D. Ga. 2004).[31] Laying to one side plaintiff's subjective opinion about Breeding's sexual proclivities, the strongest support for this element of a sexual harassment claim is the legal inference stated by the Eleventh Circuit's opinions in *Llampallas*, *supra*, and *Fredette v. BVP Management Associates*, 112 F.3d 1503 (11th Cir.1997): that is,

---

two warnings and, on the second occasion, indicated that he would not tolerate any further horseplay of this sort on my part. Nothing like that has happened since.

8. There was nothing sexual about the broomstick goosing or poking. I was just joking around and horseplay — grown men acting like teenage boys in a locker room. Regardless, as the Warehouse Manager, I should have known better and should not have participated in or initiated such conduct.

9. I have never touched any Warehouse employee, including Mr. Parker, in any sort of a sexual way.

*Id.*, Exhibit C (Declaration of Ronnie Breeding), at 367, ¶¶ 7-9.

[31] The relevant passage from the *Ashmore* opinion cited in text reads as follows:

The Court finds that sufficient evidence was presented from which a reasonable jury could have concluded that Fye's harassment of Plaintiffs was based upon their male gender. Although the evidence is disputed as to whether Fye was homosexual, this does not answer the question. The issue is whether his conduct was directed at Plaintiffs because they were male. Fye's conduct, which was reserved only for male employees and included the simulation and discussion of sexual acts between males, supports the jury's conclusion that the harassment was gender based.

*Ashmore v. J.P. Thayer Co., Inc.*, 303 F. Supp. 2d 1359, 1369 (M.D. Ga. 2004).

the act of sexual harassment itself creates an inference that the harasser harbors a sexually discriminatory animus towards the plaintiff. When a person "sexually harasses" another, *i.e.*, makes comments or advances of an erotic or sexual nature, we infer that "the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers."

*Llampallas*, 163 F.3d at 1246 (quoting *Fredette*, 112 F.3d at 1505) (alteration in original).

On the other hand, the evidence is clear that Breeding did not subject Office and Payroll Manager Glenda Vaughn, the only female working in defendant's Decatur branch,[32] to harassing conduct. Given the separate areas in which Breeding and Ms. Vaughn worked, however, and the fact that he neither had any regular contact with nor supervisory authority over her,[33] that is not strong support for an argument that Breeding "treated one sex in a mixed-sex workplace differently than the other sex." *Stancombe*, 652 F. App'x at 733. Indeed, it is a slim reed upon which to lean so much evidentiary weight.

Despite the weakness of evidentiary support for this element of a *prima facie* case, the court will assume for the sake of discussion that plaintiff has presented

---

[32] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 67, 110, 282.

[33] *See id.*, Exhibit D (Declaration of Glenda Vaughn), at 369, ¶ 3 ("I work in the Office at the Decatur facility and have never worked in the Warehouse. I report directly to Mr. Joey Lee, Branch Manager in Decatur, *and have never been supervised by or reported to Mr. Breeding, the Warehouse Manager*.") (emphasis supplied).

sufficient evidence from which a reasonable jury could conclude that Breeding's harassment of plaintiff was based upon plaintiff's gender.

### 4.   Was the harassment sufficiently severe and pervasive as to create an abusive work environment

The requirement for an employee to establish that the harassment was sufficiently severe or pervasive as to alter the terms and conditions of his employment includes both a subjective and an objective component. *See*, *e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Plaintiff subjectively believed that the actions of his supervisor were severe. But that is neither the sole, nor the determinative, consideration. Instead, the plaintiff "must prove that the environment was *both* subjectively *and* objectively hostile." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir.2010) (*en banc*) (emphasis supplied); *see also*, *e.g.*, *Mendoza*, 195 F.3d at 1246 ("The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, *and this subjective perception must be objectively reasonable*.") (quoting *Harris*, 510 U.S. at 21-22) (emphasis supplied).

The Supreme Court emphasized that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting

*Harris*, 510 U.S. at 23).  The Eleventh Circuit elaborated that principle in *Mendoza*,

saying that:

> The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim . . . subjectively perceive[s] . . . to be abusive." [*Harris*, 510 U.S.] at 21, 114 S. Ct. 367.  Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale* [*v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81] 118 S. Ct. at 1003 (1998) (quoting Harris, 510 U.S. at 23, 114 S. Ct. 367).

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367).  The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.  *Id.*; *see Harris*, 510 U.S. at 23, 114 S. Ct. 367; *Henson*, 682 F.2d at 904; *Faragher* [*v. City of Boca Raton*, 524 U.S. 775,] 118 S. Ct. [2275, 2283 (1998)] (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances' ").

*Mendoza*, 195 F.3d at 1246 (alterations supplied).

The conduct attributed to plaintiff's supervisor falls short of the level that a

reasonable person would perceive as sufficiently severe or pervasive to alter the terms or conditions of employment. While Breeding's actions of jabbing a broomstick and other objects into plaintiff's buttocks were clearly inappropriate, vulgar, and — in those incidents in which Breeding taunted plaintiff by placing his check stub in the open crotch of his pants and saying "come get it" — clearly repulsive, the court "cannot look solely to the 'physical acts performed.'" *Stancombe*, 652 F. App'x at 735 (quoting *Oncale*, 523 U.S. at 82). The Eleventh Circuit in *Stancombe* found somewhat similar conduct[34] to not be sufficiently severe or pervasive because it only involved two incidents over a one-month period, and "scant evidence" supported the conclusion that the harassment affected plaintiff's job performance. *Id*. Similarly, the conduct at issue in this case consisted of a handful of incidents over a four-month period that ceased after Breeding received a second warning from the Branch Manager in February of 2017. The objectionable conduct was not resumed after that warning, or after the date on which plaintiff returned to work following his September 2017 foot surgery. There was no harassment from then until his termination in August 2018.[35]

---

[34] Plaintiff in *Stancombe* alleged that his harassing coworker "hugged [him] and touched his buttocks three times in succession"; and, two days later, his coworker approached him while he was alone and kneeling, "grabbed his head, and made three pelvic thrusts in his face." 652 F. App'x at 731.

[35] *See* doc. no. 22 (Defendant's Evidence in Support of Summary Judgment), Exhibit A (Plaintiff's Deposition), at 136, 204.

Even though plaintiff claimed that one of the incidents involving the end of a hammer was painful,[36] he did not present evidence that Breeding's conduct was "physically threatening or humiliating," or that the cumulative effect of all of Breeding's conduct impaired, much less "unreasonably interfered with," his job performance.

In conclusion, Breeding's conduct falls short of supporting an actionable Title VII hostile-work-environment, sexual-harassment claim.

**B.    Count Two** — *Retaliation*

Plaintiff failed to respond to defendant's argument that summary judgment should be entered in its favor on his retaliation claim.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See*, *e.g.*, *Continental Technical Services, Inc. v. Rockwell International Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made is waived. . . .").

> In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation.  That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.

*Greenlaw v. United States*, 554 U.S. 237, 244 (2008).  *See also*, *e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing

---

[36] *Id.* at 185, 189.

summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).[37]

---

[37] *Cf., e.g., Lucas v. W.W. Grainger, Inc.* 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir.

For all of the foregoing reasons, count two of the plaintiff's complaint will be dismissed without further discussion.

**C.    Count Three** — *Intentional infliction of emotional distress*

Under Alabama law, an action for the intentional infliction of emotional distress and the so-called "tort of outrage" are conceptually deemed to be synonymous. *See, e.g., Ex Parte Lumbermen's Underwriting Alliance,* 662 So. 2d 1133, 1134 (Ala. 1995) (recognizing that intentional infliction of emotional distress is "otherwise known as the tort of outrage"); *Sanders v. Shoe Show, Inc.,* 778 So. 2d 820, 823 (Ala. Civ. App. 2000) (same); *see also Sphere Drake Ins., P.L.C. v. Shoney's, Inc.,* 923 F. Supp. 1481, 1491 (M.D. Ala. 1996) (stating that, under Alabama law, the tort of outrage and the intentional infliction of emotional distress are "the same cause of action").

The Alabama Supreme court first recognized the cause of action in *American Road Service Co. v. Inmon,* 394 So. 2d 361 (1980), saying that:

> We . . . join with our sister states . . . in appreciating that willful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby, and we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.  The emotional distress thereunder must be

1989) (declining to address issue for failure of party to argue it in its brief on appeal).

so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Id*. at 365 (internal citations omitted). To establish such a claim, regardless of whether it is characterized by a plaintiff as "outrageous," or as an intentional infliction of emotional distress, the plaintiff must demonstrate: "(1) that the defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct; (2) that the defendants' conduct was extreme and outrageous; and (3) that the defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Callens v. Jefferson County Nursing Home,* 769 So. 2d 273, 281 (Ala. 2000) (citing *Jackson v. Alabama Power Co.,* 630 So. 2d 439 (Ala. 1993), and *American Road Service v. Inmon*, *supra*).

In any event, the Alabama Supreme Court recognizes the tort only in "egregious circumstances" and, thus, has limited its application to the following areas: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. *Callens,* 769 So. 2d at 281 (citing *Thomas v. BSE Indus. Contractors,*

23

*Inc.,* 624 So. 2d 1041 (Ala. 1993)).

In view of the fact that this court has concluded that the conduct of plaintiff's supervisor falls short of supporting an actionable Title VII hostile-work-environment, sexual-harassment claim, it would seem that the conduct of which plaintiff complains cannot fairly be characterized as "emotional distress so severe that no reasonable person could be expected to endure it." *Callens*, 769 So. 2d at 281. Even so, in cases like this one, where the court's jurisdiction is based solely upon the federal questions raised by the claims alleged in counts one and two, the court retains discretion to entertain a state-law claim that is supplemental to the federal claims. *See* 28 U.S.C. § 1367(a).[38] The district court may decline to exercise supplemental jurisdiction when:

(1)    the claim raises a novel or complex issue of State law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    the district court has dismissed all claims over which it has original jurisdiction, or

---

[38] 28 U.S.C. § 1367(a) provides that:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7; *see also L.A. Draper & Son V. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims").

Here, plaintiff's federal claims will be dismissed prior to trial.  Additionally,

plaintiff's state law claim raises complex issues of state law, "something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area." *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000). Accordingly, the balance of factors weigh in favor of declining supplemental jurisdiction, and this court exercises its discretion to dismiss plaintiff's state claim, without prejudice.

An order consistent with this memorandum of opinion will be entered contemporaneously herewith.

**DONE** this 18th day of March, 2020.

Senior United States District Judge